UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA C. MATTOX, | |
| Plaintiff, | Case No. 1:21-CV-01011 |
| v. | |
| NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORP. (d/b/a METRA) et al., | Judge John Robert Blakey |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

In this negligence action, Plaintiff sues the Northeast Illinois Regional Commuter Railroad Corp., d/b/a Metra, for injuries she sustained while deboarding a Metra commuter railcar at Chicago Union Station. [1-1]. Defendant moves for summary judgment. [61]. For the reasons explained below, this Court denies Defendant's motion.

**I.  Factual Background[1]**

Plaintiff is a regular Metra commuter who has been riding the Heritage Corridor for at least five years. [69] ¶ 2; [74] ¶ 1. Metra is a common carrier by railroad in Chicago, Illinois. [69] ¶ 1. On April 22, 2019, Plaintiff boarded a Metra train at Joliet Station with her friends, Sandra Kancauski and Holly Sheldon, and

---

[1] The following facts come from Defendant's Local Rule 56.1(a)(2) statement of material facts, [62], Plaintiff's response to Defendant's statement of material facts, [69], Plaintiff's statement of additional facts, [70], and Defendant's response to Plaintiff's statement of additional facts, [74].

1

rode to the end of the line, Chicago's Union Station ("Union Station"). *Id.* ¶¶ 4, 25. The women had traveled this commute regularly together for almost a decade. *Id.* ¶ 24.

When the train arrived at Union Station, it pulled up to the south side of Track 28, which contains at least one crosswalk where the platform dips or slopes downward. *Id.* ¶¶ 5, 54, 72. Metra did not make any kind of special announcement warning passengers that the train would stop in an area where there was a dip in the platform. [62-1] at 38; [62-2] at 14; [62-4] at 25–26.

Once the train stopped, some passengers exited; Ms. Kancauski was the first of the three friends to disembark. [69] ¶¶ 5–6. She took three steps, looked down, and saw a "giant step" on the ground. *Id.* ¶ 33. Ms. Kancauski testified that the train "pulled up to a point we don't normally pull up to." [62-3] at 27. Usually, the train stopped at a point "where, when they opened the car door, you could just step down." *Id.* at 16. But on that day, because of ongoing construction, there was "a cross walk from one train track to the other or where you could take like a cart and ride on that like to cross over which forms this like big divot in the ground." *Id.* at 16–17. On this date, the step off the train was "much further" than normal, and, while deboarding Ms. Kancauski thought, "oh, wow, that's a long drop." *Id.* at 27.

Ms. Sheldon deboarded next. [69] ¶6. Like Ms. Kancauski, Ms. Sheldon testified that the train stopped in a spot where there was a dip. [69-2] at 16. Although she was able to deboard without incident, in doing so, she "clutched onto" the railing "pretty hard." [69] ¶ 28. When asked if it looked like others were having

2

trouble stepping onto the platform, Ms. Sheldon testified that, "everybody was kind of taken back by how far the step down was because it was much more than normal," and she thought people were saying "be careful" because of where the train had stopped. [62-2] at 20. The drop was "at least two feet, if not more." *Id*. at 46.

Then, it was Plaintiff's turn. Plaintiff walked into the aisle, put her bag on one shoulder, put her lunch bag over her arm, and headed toward the vestibule of the train car toward the steps. [69] ¶ 7. When asked at her deposition, Plaintiff did not specifically remember if she looked down at the train platform before stepping down, but she recalled that she stepped forward normally off the train, as if she was walking down stairs, and held onto the railing with her left hand. [62-1] at 24. When she tried to step onto the platform, however, she "ran out of leg." *Id*. at 83. There was no platform at the normal step level she was used to, and she fell onto the platform in a "tuck and roll" manner. [69] ¶ 14.

Following the fall, Metra conductor Sean Crowley, consistent with his job responsibilities, approached Plaintiff to ask whether she was okay and whether she needed medical assistance; Plaintiff declined. *Id*. ¶¶ 16, 36; [74] ¶ 23. Plaintiff was then wheeled to the Amtrak Police department where a report was prepared; Plaintiff did not complete any paperwork for inclusion in the report. [69] ¶ 17; [74] ¶ 6. The Amtrak police report states that Plaintiff missed a step while exiting the train, but Plaintiff testified that this statement is "incorrect." [62-1] at 84. Plaintiff did not slip or trip; in fact, she did not see anything on the train steps or platform that did not belong, did not see debris or oil on the steps, and saw the usual station lighting. [69]

¶¶ 18–19. According to Plaintiff, she fell because of the distance between the train and the platform. *Id.* ¶ 19. A day or two after the accident, Plaintiff told Conductor Crowley that she was embarrassed that she fell; Crowley testified that Plaintiff specifically told him that she missed a step, but Plaintiff denies making such a statement. *Id.* ¶ 71.

For some time prior to 2016, Metra crews used yellow step stools to assist passengers entering and exiting the train. [62-4] at 38; [70-1] at 14. By the time of the incident, however, Metra had suspended the use of step stools. *See* [62-3] at 35; [62-4] at 38. Instead of step stools, according to Crowley, passengers could request to use a handicap lift if they needed assistance deboarding the train. [62-6] at 57. Crowley testified that, at some point before April 22, 2019, Plaintiff asked Crowley for a step stool, and Crowley told her he did not have a stool but could help her use a lift. [62] ¶ 65. It is not disputed that, on the date of the incident, Metra made neither a stool nor a lift available to Plaintiff or other passengers to deboard from the train.

At Union Station, the Amtrak train director assigns tracks for Metra trains using a signals system. [69] ¶ 40. Based on these signals, Metra engineers determine generally where to stop or "spot" the train at each station from Joliet to Union Station. [74] ¶ 25. All Metra employees must comply with Amtrak Timetable Number 5, which provides that on "tracks 26, 28, 30 and north station tracks 3 and 17, trains will stop clear of vehicle access road crossings." [69] ¶ 43.

Confusingly, two types of crossings exist at Union Station: vehicle access road crossings, covered by Timetable Number 5, and pedestrian crossings. *Id.* ¶ 72. Metra

4

employees themselves seem to confuse them. Conductor Crowley and the Metra engineer operating the train on April 22, 2019, Pedro Salazar, testified that Track 28 has only one vehicle access crossing, [69] ¶¶ 54, 72; but Metra conductor Michael Sortor testified that the Track had two. [74] ¶ 31. Daniel Marinellie, Metra's road foreman of engineers, testified that there are several "service" crossings on the track, but only one is covered by Timetable Number 5. [62] at 11–12.

Conductor Crowley testified that, pursuant to Timetable No. 5, he would not open the doors if the train were to stop in a location where the doors are above a vehicle access crossing. [74] ¶ 26. He explained that there is a dip in the platform where those crossings are located. *Id.* ¶ 27. Crowley recalled that on the date of the incident, the Metra train stopped before the vehicle access road and the doors were not located above the vehicle access road crossing. [69] ¶ 69. Engineer Salazar also testified that he stopped short of and did not block the vehicle access road crossing. *Id.* ¶ 55. But when shown a photograph of the train at the platform on April 22, 2019, Salazar agreed that it appeared that "some of the cars are on top of [a] vehicle access road crossing." [62-5] at 43-44.

As a result of the accident, Plaintiff sued Metra, alleging negligence in failing to provide a safe means of exit from the train and stopping the train by an area of the platform where it was unsafe to disembark, failing to provide conductors or other personnel to assist passengers in exiting the train at that location, failing to warn the plaintiff of the unsafe and hazardous condition, and failing to make an adequate

5

inspection of the area of the platform where Plaintiff was forced to disembark.[2] [69] at 1–2. Defendant moves for summary judgment. [61]. For the reasons discussed below, the Court denies Defendant's motion.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury

---

[2] Plaintiff also sued the National Railroad Passenger Association (d/b/a Amtrak), but she dismissed the claim against Amtrak with prejudice. *See* [52], [53].

could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

### III. Discussion

Defendant claims an entitlement to summary judgment because: (1) it did not owe Plaintiff a duty of care for the premises, *i.e.,* the train platform, because Amtrak, not Metra, owns the train platform; (2) it did not breach its duty of care as a common carrier to Plaintiff; (3) Plaintiff has not offered evidence that the train door's location above a crosswalk was an unsafe and hazardous condition; and (4) Plaintiff has not established that Metra's conduct was a proximate cause of Plaintiff's injuries. The Court will address these arguments in turn.

To establish a claim for negligence in Illinois, a plaintiff must prove that "the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury." *Krywin v. Chi. Transit Auth.*, 938 N.E.2d 440, 447 (Ill. 2010). The existence of a duty is a question of law for the Court to decide. *Krywin*, 938 N.E. at 452. The issues of breach and proximate cause are factual questions for a jury to decide, provided there is a genuine issue of material fact regarding those issues. *Espinoza v. Elgin, Joliet and Eastern Ry. Co.*, 649 N.E. 1323, 1326 (Ill. 1995). If the plaintiff fails to establish any one of the elements of negligence, summary judgment for the defendant is proper. *Pavlik v. Wal-Mart Stores, Inc.*, 753 N.E.2d 1007, 1010 (Ill. App. Ct. 2001).

### A. Metra owed Plaintiff a duty of care.

Defendant first argues that Plaintiff cannot show that it owed her a duty of care to maintain the premises at Union Station because Amtrak, not Metra, owned

7

and maintained the platform on Track 28. [63] at 9. Defendant argues that it cannot be liable on a theory of premises liability for property it neither owned nor maintained. *Id.*

The Court agrees that Metra cannot be liable on a premises liability theory for failing to maintain the track it neither owned or maintained. *See, e.g., Hoiseth v. Northeast Illinois Regional Commuter R. Corp.*, 562 N.E.2d 602, 603 (Ill. App. Ct. 1990) (affirming summary judgment for Metra on a negligence claim based on premises liability theory where Metra did not own or maintain railroad track at issue). But the point remains irrelevant because, as explained below, Defendant nonetheless owes Plaintiff a duty of care based upon its status as a common carrier. *See* [63] at 10.

Illinois law has long held that a "common carrier has a duty to its passengers to exercise the highest degree of care, not only to carry them safely to their destinations, but to provide them with a reasonable opportunity to leave the conveyance safely." *Krywin*, 938 N.E.2d at 447 (citing *Chicago T.T. R.R. Co. v. Shmelling*, 64 N.E. 714, 717 (Ill. 1902) (recognizing duty of carrier to its passengers to afford them reasonable opportunity to leave trains safely)); *see also New v. Pace Suburban Bus Service*, 923 N.E.2d 310, 317 (Ill. App. Ct. 2010) (noting that common carrier has duty to exercise highest degree of care consistent with the practical operation of its conveyances to protect its passengers). The common carrier's duty continues until the passenger has had a reasonable time to alight from the train, and a passenger has "a right to assume that the company will not expose him to any

8

danger which by the exercise of due care can be avoided, and that the company has done its duty in the matter of providing him safe landing." *Chicago T.T.R. Co.*, 64 N.E. at 716–17.

Defendant concedes its status as a common carrier. As a result, Defendant owed Plaintiff a duty of care, and Plaintiff had the right to assume it would exercise such due care by providing her a reasonable opportunity to exit the train safely. The Court thus declines to grant summary judgment based upon the duty of care element.

**B. Evidence of breach exists to create a genuine dispute of material fact.**

Next, Defendant argues that Plaintiff fails to present evidence that it breached its duty to Plaintiff. [63] at 10. Defendant claims the "evidence shows that Metra furnished a safe track, cars, and machinery," and provided a qualified, competent operating engineer (Salazar) and conductor (Crowley). *Id.* Such evidence, Metra argues, precludes Plaintiff's claim.

The Court disagrees. As a preliminary matter, Plaintiff has set forth evidence that Metra's engineers—here, Mr. Salazar—had latitude in determining where to "spot" the train on the track, within the parameters set forth by Amtrak through the signals system. Conductor Crowley testified that the engineers determined where to stop the train. [74] ¶ 25. And Cederic Ousley, the Assistant Superintendent of Train Movement for Amtrak at Union Station, testified that no Amtrak employee controlled or directed where Metra train crews stopped their trains on the prescribed individual tracks. *Id.* ¶ 38.

9

In contrast, Engineer Salazar testified that Amtrak dictated both the track he entered *and* where he stopped the train, *see* [69] ¶ 49. Such disputed factual questions must be resolved by a jury.

Likewise, Plaintiff has set forth evidence that Salazar spotted the train at a location on Track 28 where passengers exiting the train had a significant step down to the platform. Ms. Kancauski described the distance between the train and the platform as a "giant step," so great "that it was unsafe for any of us to get off that train at that stop." [62-3] at 40. Similarly, Ms. Sheldon testified that everybody was "kind of taken back by how far the step down was because it was much more than normal," and she thought people were saying "be careful" because of where the train had stopped. [62-2] at 20. And Plaintiff herself testified that normally the distance was approximately a "foot" but on that day, it was at least "double" the distance. [69] ¶ 23.

Significantly, several of Metra's own employees testified consistently. Both Conductor Crowley and Conductor Sortor testified that "vehicle access road crossings" at Union Station create a dip in the platform, and a reasonable jury could infer from the above testimony that Plaintiff's train stopped at such a crossing on April 22, 2019, exposing Plaintiff to the dangerous drop at exit. [74] ¶ 27; [70-1] at 10. Conductor Crowley testified that Amtrak policy requires all Metra employees to comply with Timetable Number 5 and stop clear of the crossings for safety reasons, suggesting the recognition of the danger posed by the extreme drop that resulted when the train stopped on the crossing. *See* [62-6] at 29–21.

The parties dispute whether the train stopped short of all vehicle access crossings, or whether the train had blocked one, causing the door to open above a vehicle access crossing where a dip would be present. This confusion appears to stem from the factual dispute over the number of vehicle access or other crossings on Track 28. Defendant asserts that the evidence shows that Mr. Salazar stopped the train clear of the only vehicle access road crossing on Track 28, and notes that Mr. Crowley indicated that he did not see any train doors stop above a vehicle access crossing at the time of the incident. [63] at 10. But there is evidence to the contrary: Mr. Sortor, who has been a Metra conductor for over twenty-one years testified that there are two vehicle access crossings on Track 28. [74] ¶¶ 28, 31. And during her deposition, Ms. Kancauski described the location where the train stopped and doors opened as a "crosswalk from one train track to the other or where you could take like a cart and ride on that like to cross over which forms this like big divot in the ground. So it's not a platform. It's a divot." [62-3] at 16–17. The existence of a vehicle access road crossing at the doors of the train would further support Plaintiff's claim that there was a substantial drop to the platform.

Finally, Mr. Marinellie testified that in past years, Metra has used step stools to assist passengers to deboard the train in situations where the loading platform was extraordinarily low. [62-4] at 38. But the parties agree that neither step stools nor lifts were provided for passengers to deboard in this case. And Conductor Crowley acknowledged during his deposition that a vehicle access road crossing could be an unsafe condition for a passenger, and that he would not open the doors if the train

11

doors had not cleared such a crossing. [62-6] at 35–37. A jury will have to decide whether he nonetheless did so in this case.

As a common carrier, Defendant had a duty of care to provide its passengers with the reasonable opportunity to depart from the train safely. Because Plaintiff has offered evidence that, despite this duty, on the date in question, Metra stopped its train at a location on the track where the distance between the train and the platform made Plaintiff's exit unsafe, the Court denies summary judgment on this basis.

### C. Evidence exists that the distance to the platform was an unsafe and hazardous condition.

Defendant acknowledges that there is an "issue" in this case of whether the train door was located above a crosswalk on Track 28 but argues that summary judgment should be granted because there has been no evidence to show that the distance created an unsafe and hazardous condition. [63] at 11. Defendant also suggests that Plaintiff has failed to provide evidence to defeat summary judgment because she has not provided expert testimony regarding the distance between the train and sidewalk and has not otherwise offered any evidence as to the distance between the last step of the Metra door and the platform. *Id.* at 11. Defendant cites two premises liability cases to support its point: *Ward v. Menard, Inc.*, No. 18-cv-05107, 2020 WL 7385454, at *5 (N.D. Ill. Dec. 16, 2020), and *Hoiseth*, 562 N.E.2d at 606. Neither case holds that plaintiffs must offer expert testimony to prevail on claims such as those at issue here.

In *Ward*, the plaintiff sued Menards for negligence on a premises liability theory after falling on a sidewalk with a "slab deviation." *Ward,* 2020 WL 7385454, at *1. Menards moved for summary judgment arguing that the sidewalk deviation did not pose an unreasonable risk of harm to the plaintiff and was "de minimis" as a matter of law. *Id.* at *2. The court granted summary judgment for Menards, finding that the plaintiff failed to provide "*any* evidence that the slope of the sidewalk where she fell was unreasonably dangerous or even that the slope was such that it increased the risk of tripping on the deviation between the sidewalk square where she fell." *Id.* at *15 (emphasis added). The height of the slope at issue was between a half-inch and an inch and the court found that the "de minimis" doctrine of premises liability applied under Illinois law. *Id.*[3] Because the plaintiff presented neither evidence on the grade of the slope nor expert testimony that the slope was dangerous, the court concluded the plaintiff's negligence claim failed as a matter of law. *Id.* at *19.

In *Hoiseth*, the plaintiff was injured on a sloped railroad platform while waiting to board a commuter train, and sued the railroad that owned the platform on a premises liability theory. *Hoiseth,* 562 N.E.2d at 603. The court affirmed summary judgment for the defendant because the "entire basis of the plaintiff's claim" was the condition of the platform, yet she failed to present *"any* evidence establishing the dangerous nature of the slope of the platform." *Id.* at 605 (emphasis added). The court reasoned that, to prevail in a negligence action based upon the design of a

---

[3] Under Illinois law, "*de minimis* or slight defects frequently found in traversed areas are not actionable, as a matter of law." *Ward*, 2020 WL 7385454, at *3 (citing *Gillock v. City of Springfield*, 644 N.E.2d 831, 834 (Ill. App. Ct. 1994)).

13

sloping surface, a plaintiff "must present evidence of the dangerous nature of the slope, that the slope was the proximate cause of the plaintiff's injuries and that the landowner had notice of the defect." *Id.* (citing *McCann v. Bethesda Hospital*, 400 N.E.2d 16, 20 (Ill. App. Ct. 1979)). Because Hoiseth failed to present such evidence, the claim failed.

This case, however, is neither *Ward* nor *Hoiseth*. Plaintiff here does not rely upon a premises liability theory of liability. And her claim does not concern an injury caused by falling into or tripping over a sloped surface. Rather, Plaintiff's claim concerns the distance between the train and the platform; it is not about the slope in the ground at all. The heart of Plaintiff's claim is that Metra was negligent in failing to provide a safe means of exit from the train and stopping the train in an area of the platform where it was unsafe to disembark because the train was too far from the platform. *See* [68] at 1-3.

Moreover, in contrast to the plaintiffs in *Ward* and *Hoiseth*, Plaintiff *has* presented evidence about the dangerous nature of the drop between the train and the platform. For example, Plaintiff testified that the step down was typically a foot, but that day, the drop to the platform was at least two feet, double the usual distance. [69] ¶ 23. Similarly, Ms. Sheldon testified that the drop was "at least two feet, if not more." [62-2] at 46.

In short, while helpful in many negligence cases, expert testimony is not required for Plaintiff to establish that the distance between the train and the platform was unsafe. A recent Illinois Appellate Court case, *Thompson v. LaSpisa*,

14

No. 1-21-1448, 2023 WL 5537068, at *5 (Ill. App. Ct. Aug. 23, 2023), remains instructive: there, the court discussed, in the context of medical malpractice, when expert testimony is necessary to prove a negligence case. The court explained that it is "incorrect" to say, as a universal rule, that expert testimony is necessary to prove the elements of a medical negligence action. *Id.* In a typical case it is usually required since proof so often consists of specialized medical knowledge beyond the ken of the ordinary juror, but "if specialized knowledge is *not* required—then expert testimony is not needed." *Id.* (citing *Johnson v. Armstrong*, 211 N.E.3d 555 (Ill. 2022)). This is "really nothing more than a restatement of the rules of evidence regarding expert testimony." *Thompson*, 2023 WL 5537069, at *5.

As in *Thompson*, no specialized knowledge is required for jurors to understand that a two-foot drop between the train door and the platform exposed Plaintiff to an unsafe, dangerous condition. Plaintiff need not offer expert testimony to win on her claim, and the Court cannot grant summary judgment on this basis.

**D. There is a triable issue of fact on proximate cause.**

Finally, Defendant argues that Plaintiff has failed to present any evidence that Metra's actions were a proximate cause of her injuries. [63] at 13.

Under Illinois law, proximate cause has two distinct requirements: cause in fact and legal cause. *Abrams v. City of Chicago*, 811 N.E.2d 670, 675 (Ill. 2004). A defendant's conduct is a "'cause in fact' of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." *Id.* (quoting *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068 (Ill. 1999)). In contrast,

15

a defendant's conduct is a legal cause if "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Abrams*, 811 N.E.2d at 675.

Generally, proximate cause is a question of fact, though it can become a question of law if the plaintiff fails to establish facts demonstrating that she is entitled to recover. *Keating v. 68th and Paxton L.L.C.,* 936 N.E.2d 1050, 1065 (Ill. App. Ct. 2010); *see also Abrams*, 811 N.E.2d at 674. To survive summary judgment, Plaintiff must present "some affirmative evidence that it is 'more probably than not true' that the defendant's negligence was a proximate cause of the plaintiff's injuries." *Johnson v. Ingalls Mem. Hosp.*, 931 N.E.2d 835, 847 (Ill. App. Ct. 2010) (quoting *Borowski v. Von Solbrig*, 328 N.E.2d 301, 305 (Ill. 1975)).

Under these standards, proximate cause remains a question of fact here. Defendant emphasizes Plaintiff's familiarity with Union Station and the train platforms, and also notes Plaintiff's admission that she was facing forward rather than looking down while departing the train. [63] at 13. And, to be sure, this evidence may support Defendant's defense. But the Court cannot say that Plaintiff has provided no affirmative evidence that Defendant's negligence was a proximate cause of Plaintiff's injuries.

On the contrary, the record contains plenty of evidence supporting proximate cause. The record shows that Metra's engineers were responsible for spotting the train at a spot on the platform. *See* [74] ¶ 25. The record also shows that, when Plaintiff fell, the engineer had stopped the train at a point on the platform where the platform dipped, such that, when the doors of the train opened, passengers were

16

exposed to a significant drop between the train and the platform. The record shows that the platform was adequately lit and there was no debris on the platform itself, suggesting that the extreme drop caused Plaintiff's fall. *See* [69] ¶¶ 18–19. Based upon this evidence, the Court declines to grant summary judgment on Plaintiff's negligence claim.

### IV. Conclusion

For the reasons explained above, this Court denies Defendant's motion for summary judgment, [61]. Plaintiff may proceed on her negligence claim.

Date: March 25, 2024                                          Entered:

                                                                                 John Robert Blakey
                                                                                 United States District Judge